**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| SHINGAIRAI FERESU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:14-cv-01227-TWP-MPB |
| | ) | |
| TRUSTEES OF INDIANA UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant the Trustees of Indiana University ("IU") ([Filing No. 42](#)). *Pro se* Plaintiff Shingairai Feresu, ("Dr. Feresu"), is a former employee of IU's Bloomington, Indiana campus. As a professor at IU, she was subjected to a hostile work environment and eventually terminated. After her termination, she brought this action under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Equal Pay Act ("EPA"), alleging employment discrimination based on her race, nationality, and sex. IU filed a Motion for Summary Judgment, asserting, among other things, that Dr. Feresu did not meet IU's legitimate expectations and her EPA claim is outside the scope of her administrative charges of discrimination. For the following reasons, IU's Motion is **granted**.

## I. BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Dr. Feresu as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Pursuant to local rule, the facts that Dr. Feresu asserts are

true, to the extent admissible evidence supports them. L.R. 56-1(f)(2). In addition, the Court is to assume that the facts claimed and supported by admissible evidence by the movant (in this case IU) are admitted without controversy except to the extent that: (a) the non-movant (in this case Dr. Feresu) specifically controverts the facts in her statement of "Material Facts in Dispute" with admissible evidence, or (b) it is shown that IU's facts are not supported by admissible evidence, or (c) the facts, alone or in conjunction with other admissible evidence, allow the Court to draw reasonable inferences in Dr. Feresu's favor sufficient to preclude summary judgment. See S.D. Ind. LR 56-1(f)(1).

## A.    Factual Background

Dr. Feresu was born in Zimbabwe and came to the United States of America to study and work. She became a United States citizen in November 2011. She studied at Boston University and the University of Michigan and obtained a PhD.

In 2010, Dr. Feresu was hired by IU as an assistant professor in the field of epidemiology. IU contends that Dr. Feresu began her work there in August 2010, while Dr. Feresu recalls starting in July 2010 (Filing No. 44-1 at 2, 7). This one month difference is not material. Before joining IU, Dr. Feresu was an adjunct professor at the Center for Afro-American and African Studies at the University of Michigan from 2001 to 2002 and a lecturer in the Department of Epidemiology, School of Public Health, at the University of Michigan in 2003. From 2004 to 2010, she was an assistant professor in the Department of Epidemiology, College of Public Health, at the University of Nebraska Medical Center (Filing No. 44-1 at 9). Dr. Feresu left her employment at the University of Nebraska Medical Center to join IU. Overlapping her time at the University of Michigan, the University of Nebraska, and IU, she also was a visiting professor at the Department of Community Medicine at the University of Zimbabwe from 2001 to 2012. *Id.*

In Dr. Feresu's employment offer letter, IU explained the terms of her employment and the terms of obtaining tenure as a professor. The letter explained that she was being hired as an assistant professor, which was a three-year probationary tenure-track position. The letter further noted,

> Your tenure clock will also begin on August 1, 2010, with the tenure decision to be made no later than May 1, 2016, assuming continuous full-time service and positive reappointment decisions. As generally is the case at Indiana University, teaching, research/creative activities, and service are included in your responsibilities as a faculty member. Please note that Indiana University bases its tenure and promotion recommendations upon performance in these three areas. Faculty members are normally expected to excel in one of the categories and to be at least satisfactory in the other two categories. In order to achieve tenure and/or promotion, you should ensure that you are meeting the standards established within your home department, school and campus through ongoing discussions with your chairperson, other senior faculty, and during annual evaluation reviews.

([Filing No. 44-1 at 7](#).)

The employment offer letter also explained, "You will be paid at an annual rate of $72,000 for the 2010–11 academic year (10-month salary base) . . . . You should be aware that as part of your 10-month academic year commitment, you are expected to secure external funding for research." *Id.*

In the letter, IU explained to Dr. Feresu,

> We will provide $10,000 in start-up funds to facilitate your research, teaching, and service obligations. Anything purchased with these funds remains the property of your Department although they will be dedicated to your use. If all of these start-up funds are not spent in your first two years, they can be banked essentially indefinitely and used any time needs arise.

*Id.* at 8. IU also noted, "[w]e will provide you with the usual and customary setup that includes a computer, other related equipment, and necessary supplies. We will provide reimbursement for travel and moving expenses of up to $5,000 for relocation . . . ." *Id.*

The criteria for tenure was detailed in Dr. Feresu's employment offer letter, which noted tenure and promotion recommendations are based on the three areas of teaching, research, and service. *Id.* at 7. The offer letter explained that IU's tenure determination is usually at least a six-year process. Faculty are usually hired into an initial three-year, tenure-probationary appointment. If faculty members are reappointed in their third year, they then can receive annual one-year reappointments based on demonstrated growth in the areas of teaching, research, and service that, on a cumulative basis, makes it likely that the candidate will receive tenure at the end of the multi-year probationary period. The third-year review is the most elaborate and thorough review and is the first critical review for pre-tenured faculty. In the event that the pre-tenure review results in a negative recommendation, further employment is not offered to the faculty member. *Id.* at 2–3. When reappointment is not offered after the third-year pre-tenure review, the faculty member is allowed a "terminal year" of employment during which they continue to be employed but their salary remains frozen at the level set in the previous budget adjustment (Filing No. 44-3 at 2).

When Dr. Feresu began her employment at IU in 2010, she was assigned to the Department of Kinesiology in the School of Health, Physical Education, and Recreation. She, along with a few other faculty members, had the task of starting a new Department of Epidemiology and Biostatistics to offer masters and doctoral programs. In July 2012, the School of Health, Physical Education, and Recreation transitioned into the School of Public Health, and Dr. Feresu transitioned into the newly created Department of Epidemiology and Biostatistics (Filing No. 44-1 at 2, 7, 9).

Just prior to this transition, IU notified Dr. Feresu in April 2012 that her initial appointment to IU as an "assistant professor" was not consistent with her professional accomplishments and that she should have been designated as an "associate professor." This improvement in rank was

applied retroactively to Dr. Feresu's hire date but did not automatically affect her salary or her upcoming tenure review (Filing No. 56-6 at 1–2).

During her entire period of employment with IU, Dr. Feresu describes that she was subjected to sex and race discrimination. She explains, "[w]hen initially hired, I was brought in at a lower rank than my White counterparts despite my vast experience. I was also given lower start up research funding than my White colleagues." (Filing No. 44-2 at 4.) In addition, she asserts she was "subjected to sexist comments from management such as, 'You're a good woman' or 'You're a good Mother.'" *Id.*

On October 30, 2012, approximately ten weeks into the semester, Dr. Feresu was removed from a class that she was teaching without any notice or warning. IU contends her removal was the result of student complaints. However, Dr. Feresu contends her removal from her class did not follow IU's policies, procedures, or protocol. The students' complaints were fabricated and she actually received several positive assessments from her students (Filing No. 23 at 2–3; Filing No. 44-2 at 4). This removal from class caused Dr. Feresu great stress and anxiety.

Dr. Feresu's third-year pre-tenure review began in March 2013. The tenure review process started with a Pre-Tenure Review Committee ("the Committee"), composed of three IU professors from different departments (Filing No. 44-1 at 9–11). The Committee reviewed the materials submitted by Dr. Feresu for her third-year pre-tenure review. After their review of the materials and consideration of the three areas of tenure criteria (teaching, research, and service), the three Committee members voted "Teaching: 2 – effective and 1 – ineffective. Research: 3 – unsatisfactory. Service: 1 – good and 2 – satisfactory." (Filing No. 44-1 at 9.) "The unanimous recommendation of the Committee was Non-reappointment." *Id.*

In its recommendation report, the Committee explained how it reached its conclusion regarding Dr. Feresu's unsatisfactory research. It explained that, of Dr. Feresu's fourteen peer-reviewed published articles, three book chapters, and two manuscripts accepted to open online journals, only the two manuscripts accepted to open online journals were produced by Dr. Feresu after she joined IU. The rest of her cited work had been completed before joining IU. *Id.* at 10. The Committee also raised a concern about the academic quality of the publishing outlets Dr. Feresu had selected, noting that her book was published by a vanity press, and open online journals are not subject to rigorous academic standards. *Id.* "The Committee determined that Dr. Feresu's level of performance at IU fails to meet the standards of excellence in research for potential tenure." *Id.*

In its review, the Committee also noted Dr. Feresu's positive contributions to the school in developing epidemiology curricula and starting the epidemiology program. The Committee also noted the generally positive evaluations from Dr. Feresu's peers and students. *Id.* Despite Dr. Feresu's contributions in teaching and service, the Committee unanimously recommended non-reappointment because of Dr. Feresu's unsatisfactory research performance.

After the Committee made its recommendation of non-reappointment, Dr. Ka He ("Dr. He"), Professor and Chair of the Department of Epidemiology and Biostatistics, reviewed Dr. Feresu's submitted materials and determined that he "could not find convincing evidence to rebut the committee's recommendation." (Filing No. 44-1 at 33.) Dr. He found that the Committee's review was "fair and evidence based," and he also recommended that Dr. Feresu not be reappointed. *Id.* Dr. He noted his concerns about Dr. Feresu's research efforts and contribution, including the lack of academic quality of Dr. Feresu's chosen publishers in online open access

journals and vanity press. *Id.* In his review, Dr. He recognized the positive contribution Dr. Feresu made to the school in helping start the Department of Epidemiology and Biostatistics. *Id.* at 34.

Following Dr. He's review, Mohammad Torabi ("Dean Torabi"), Dean of the School of Public Health, reviewed Dr. Feresu's materials, the report of the Pre-Tenure Review Committee, and the report of Dr. He and concurred with the prior recommendations to not reappoint Dr. Feresu ([Filing No. 44-1 at 35](#)). Dr. Feresu requested further review with the opportunity to supplement her materials.

The unanimous recommendation of non-reappointment was presented to Thomas Gieryn ("V.P. Gieryn"), Vice Provost for Faculty and Academic Affairs. On May 28, 2013, V.P. Gieryn requested supplemental materials and information from Dr. Feresu, the Committee, Dr. He, and Dean Torabi to help him review the recommendation of non-reappointment. *Id.* at 36. The committee reviewed Dr. Feresu's rebuttal and supporting evidence and again concluded that, "[c]onsidering the research efforts of the past three years, tenure will be highly unlikely at Indiana University." ([Filing No. 44-1 at 42](#).) Dr. He also reviewed Dr. Feresu's rebuttal and additional materials and similarly concluded that non-reappointment was appropriate. *Id.* at 43–45. Dean Torabi reviewed Dr. Feresu's service load and responded to V.P. Gieryn that, as it impacts research productivity, Dr. Feresu's help with developing the new epidemiology department was not out of line with the service load required of other faculty members. *Id.* at 46. After Dr. Feresu provided her rebuttal and additional materials, and the Committee, chair, and dean each affirmed their earlier recommendations, V.P. Gieryn reviewed the materials and recommendations and agreed with the prior levels of review that Dr. Feresu's research was unsatisfactory, and she should not be reappointed. *Id.* at 49–52.

Because reappointment was not offered to Dr. Feresu after the third-year pre-tenure review, she entered her "terminal year" of employment during the 2013–14 school year. Dr. Feresu was able to teach that school year; however, her salary remained frozen at the level set in the previous budget adjustment (Filing No. 44-3 at 2–3). Her employment with IU ended on May 31, 2014 (Filing No. 44-2 at 6).

Dr. Feresu asserts that Dr. He "hated and tortured me" and had no knowledge of administrative processes and no experience. In addition, she states that others at IU wanted to fire her and "had natural hate and disgust of me because I am 'black' and from Zimbabwe." (Filing No. 23 at 4.) Dr. Feresu believes the Pre-Tenure Review Committee was manipulated and took "orders from Vice Provost Gieryn 'who was interested in me as a woman.'" *Id.*

While still employed at IU, Dr. Feresu filed her first "Charge of Discrimination" with the U.S. Equal Employment Opportunity Commission ("EEOC") on October 17, 2013, asserting discrimination and retaliation based on race, sex, national origin, and disability (Filing No. 44-2 at 4). In her EEOC charge, Dr. Feresu alleged,

> I am a qualified individual with a disability and have been employed by Indiana University since July 1, 2010, where I currently hold the position of Associate Professor, Epidemiology & Biostatistics. During my entire period of employment with IU, I have been subjected to racist and sexually biased behavior from management within my department and school. When initially hired, I was brought in at a lower rank than my White counterparts despite my vast experience. I was also given lower start up research funding than my White colleagues. In addition, I was also subjected to sexist comments from management such as, "You're a good woman" or "You're a good Mother". I protested these comments in January 2013.

> On October 30, 2012, I was removed from the course I was teaching without due process. Additionally, because of my treatment, my disability has been exacerbated due to management's insensitivity to same. Finally, my midterm tenure review committee has shown considerable racial bias towards me such as not considering administrative work and lack of funding for research or developmental activities. As a result, during my mid-term review on April 5, 2013, I was informed that my contract would not be renewed because of my lack of research.

Based upon all of the above, I believe I have been discriminated against based upon my race, Black, National Origin, African and sex, in violation of Title VII of the Civil Rights Act of 1964, as amended. I further believe I have been retaliated against for making protected complaints in violation of Title VII. I further believe I have been discriminated against because of my disability, in violation of the Americans with Disabilities Act of 1990, as amended.

*Id.* IU received notice of the Charge of Discrimination on October 18, 2013. *Id.* at 3. The EEOC notice informed them that Dr. Feresu's charge had been filed against IU under Title VII and the Americans with Disabilities Act, but not under the EPA. *Id.*

After her employment with IU had ended and after initiating this lawsuit, Dr. Feresu filed her second Charge of Discrimination with the EEOC on August 11, 2014, asserting that IU had retaliated against her for filing the first EEOC charge (Filing No. 44-2 at 6). In her second EEOC charge, Dr. Feresu alleged,

I filed EEOC charge 470-2013-03132 on August 22, 2013.[1] I believe I was singled out, discriminated against, then retaliated against after filing my EEOC complaint. After filing an EEOC charge I was further harassed, bullied and abused by Dr. Ka He, Dr. Van Der Pol, Dr. Reece, Dr. Gilbert, Dean Torabi, and Dr. Gieryn and Provost Lauren Robel.

I was issued a right to sue letter by the EEOC on April 29, 2014.

I was told by Respondent that my research was not satisfactory because I did not have an NIH grant, yet during my three years I applied for 9 grants, 2 were external to NIH, I published 3 publications, and a book, I advised 9 out of 12 MPH students, and 3 Phd students, I taught 4 of the 6 concentration courses, and I created 8 new courses. NIH grants are not a criteria for tenure at Indiana University. None of the administrators except Dr. Ka He, have held NIH grants in their careers.

I was terminated on May 31, 2014.

I believe I was retaliated against for participating in the protected activity of filing an EEOC charge in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Americans with Disabilities Act of 1990, as amended.

---

[1] Dr. Feresu actually signed her first Charge of Discrimination on September 26, 2013, and filed it on October 17, 2013 (Filing No. 44-2 at 4).

*Id.* IU received notice of this second Charge of Discrimination on August 21, 2014. *Id.* at 5. The EEOC notice again informed them that Dr. Feresu's charge had been filed against IU under Title VII and the Americans with Disabilities Act, but not under the EPA. *Id.*

**B.     Procedural Background**

Dr. Feresu initiated this lawsuit on July 22, 2014, asserting claims under Title VII, the EPA, the Americans with Disabilities Act, and the Equal Rights Under Law Act ("Section 1981") (Filing No. 1; DKT No. 1 from Case No. 1:14-cv-1228, which was consolidated with this case). IU then moved to dismiss Dr. Feresu's claims based on IU's Eleventh Amendment immunity.

The Court granted in part and denied in part IU's motion to dismiss and directed Dr. Feresu to file an amended complaint within thirty days to correct the deficiency of improperly naming "Indiana University Bloomington" as the defendant in the case. The Court also informed Dr. Feresu that she should not reassert her dismissed claims under the Americans with Disabilities Act or Section 1981 since those claims had been dismissed based on immunity, leaving only Title VII and the EPA as the bases for her claims (Filing No. 20 at 8).

Dr. Feresu filed her Amended Complaint on October 1, 2015 (Filing No. 23). Her Amended Complaint alleges employment discrimination based on her race, nationality, and sex under Title VII and the EPA. Dr. Feresu does not allege a claim for retaliation, nor does she even mention retaliation in the Amended Complaint. *Id.* IU then moved for summary judgment on Dr. Feresu's claims.

## II.     LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary

judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

The Court notes that "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

> However, it is also well established that pro se litigants are not excused from compliance with procedural rules. [T]he Supreme Court has never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel[.] Further, as the Supreme Court has noted, in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.

*Loubser v. United States*, 606 F. Supp. 2d 897, 909 (N.D. Ind. 2009) (citations and quotation marks omitted.)

## III. DISCUSSION

IU requests summary judgment on the Title VII claim on the basis that Dr. Feresu failed to meet the legitimate expectations of IU, and thus, her employment discrimination claim cannot be supported. Regarding the EPA claim, IU contends it is outside the scope of Dr. Feresu's EEOC Charge of Discrimination, and regardless, there is no legal support for the claim. The Court will address each claim in turn.

### A.  Dr. Feresu's Title VII Employment Discrimination Claim

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may show unlawful discrimination under Title VII through a direct method or, alternatively, through the indirect burden-shifting mechanism established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Stewart v. Henderson*, 207 F.3d 374, 376 (7th Cir. 2000). Under the direct method, a plaintiff may offer direct or circumstantial evidence to prove discrimination.

*Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). Alternatively, under the indirect method of proof, the plaintiff has the initial burden of establishing a *prima facie* case that the adverse employment action was impermissibly discriminatory. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006). If the plaintiff satisfies this burden, then the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action. The burden then shifts back to the plaintiff to submit evidence that the employer's stated reason is pretextual. *Id.*

The plaintiff establishes a *prima facie* case of discrimination by presenting evidence that would allow a reasonable jury to find that: (1) she is a member of a protected class; (2) she performed satisfactorily on the job in accordance with her employer's legitimate expectations; (3) despite her reasonable performance, she was subjected to an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably. *Rhodes*, 359 F.3d at 504.

Regardless of whether a plaintiff uses the direct method, indirect method, or both methods, "the legal standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." *Id.* "Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Id.* The sole question that matters is whether a reasonable juror could conclude that the plaintiff would have kept her job if she was a

different gender, race, or nationality and everything else had remained the same. *See Achor v. Riverside Golf Club*, 117 F.3d 339, 341 (7th Cir. 1997); *Troupe v. May Dep't Stores Co.*, 20 F. 3d 734, 736–37 (7th Cir. 1994).

IU points out that, in the context of tenure decisions, "although the legal standard is the same whether the plaintiff in an employment discrimination case is a salesman or a scientist, practical considerations make a challenge to the denial of tenure at the college or university level an uphill fight." *Blasdel v. Northwestern Univ.*, 687 F.3d 813, 815 (7th Cir. 2012). This is particularly so because of "the absence of fixed, objective criteria for tenure at that level." *Id.* To establish discrimination in the context of tenure and non-reappointment, a plaintiff must show: (1) she is a member of a protected class; (2) she was qualified for tenure; (3) she was denied tenure; and (4) a similarly situated applicant not in the protected class was granted tenure. *Namenwirth v. Bd. of Regents*, 769 F.2d 1235, 1240 (7th Cir. 1985).

### 1.      IU's Contentions

IU does not dispute that Dr. Feresu is a member of a protected class, or that she was denied tenure and reappointment. However, IU asserts that Dr. Feresu was not performing her job satisfactorily to meet IU's legitimate expectations, and she was not qualified for tenure. Additionally, IU asserts that Dr. Feresu cannot show that similarly situated employees outside of her protected class were treated more favorably and granted tenure.

IU argues that Dr. Feresu's employment offer letter clearly explained how tenure and reappointment decisions would be made and the criteria of teaching, research, and service. She was informed that she would have to excel in one area and be at least satisfactory in the other two areas. The evidence, however, reveals that Dr. Feresu did not meet IU's legitimate expectations. Her third-year pre-tenure review indicated that she was unsatisfactory in the area of research. This

conclusion was unanimously reached at all four levels of review by the Committee, Dr. He, Dean Torabi, and V.P. Gieryn.

IU contends Dr. Feresu's initial materials submitted for pre-tenure review and her supplemental materials failed to demonstrate the amount and quality of research necessary to meet the standards of reappointment and tenure. Dr. Feresu had minimal new research since joining IU, and she was not published in high-quality, peer-reviewed journals. IU asserts that there is no evidence to suggest that Dr. Feresu was denied tenure and reappointment for any reason other than her failure to meet IU's reasonable expectations regarding research. Using language from *Blasdel*, IU notes that "'no reasonable jury could infer that [Dr. Dr. Feresu] was denied [reappointment] because she is a woman' or because of her race or nationality." (Filing No. 43 at 7 (quoting *Blasdel*, 687 F.3d at 824)).

Concerning the element of a similarly situated employee outside of Dr. Feresu's protected class being treated more favorably, IU asserts that Dr. Feresu cannot point to any comparator who received better treatment. There is no evidence to suggest that other associate professors who had an unsatisfactory research record were reappointed or offered tenure.

IU additionally argues that many of the alleged acts of discrimination asserted by Dr. Feresu in this action are time barred. Dr. Feresu filed her first Charge of Discrimination with the EEOC on October 17, 2013. Under Title VII, the latest any charge may be filed with the EEOC under any circumstances is three hundred days after the occurrence of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e). The three hundred day period before Dr. Feresu's October 17, 2013 first Charge of Discrimination began on December 21, 2012. Thus, any alleged acts of discrimination that took place before December 21, 2012, are time barred under Title VII.

In her first Charge of Discrimination, Dr. Feresu complained of being brought in at a lower rank and receiving less start-up funding than her "White colleagues" when she was "initially hired," which she asserts was in July 2010. This was well before the December 21, 2012 cutoff. She also identified "sexist comments" of "you're a good woman" and "you're a good mother," which she indicates were said sometime before January 2013 when she complained about the comments. Dr. Feresu also complained of being removed from one of her classes on October 30, 2012. IU points out that these occurrences took place more than three hundred days prior to the filing of the first EEOC Charge of Discrimination and are therefore time barred by 42 U.S.C. § 2000e-5(e).

### 2. Dr. Feresu's Evidentiary Support

Dr. Feresu responds to IU's Title VII argument by providing a narrative regarding her perceptions and experiences while working at IU, however none of her assertions provide direct or circumstantial evidence of any racial animus. Unfortunately, many of her assertions are not supported by any citation to supporting documents. Dr. Feresu filed many pages of unauthenticated and inadmissible documents with her Response Brief. She fails in her Brief to provide precise and correct citations to her attachments. IU noted these shortcomings in its Reply Brief, and asked the Court to strike or at least disregard Dr. Feresu's submitted attachments. As the Court previously noted, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink*, 900 F. Supp. at 1072 (citations omitted).

Recognizing that Dr. Feresu is proceeding *pro se*, the Court has elected not to strike Dr. Feresu's submissions and has carefully reviewed all of her filed briefs and materials in an attempt to decipher what support she has for her claims. Even looking past the issues of admissibility and authentication of her submitted documents, the Court determines that Dr. Feresu cannot support her Title VII claim to allow the claim to go to trial.

To begin, Dr. Feresu has not shown that the decision to end her employment was in any way connected to her race or national origin. Without evidentiary support, Dr. Feresu asserts disagreement with IU's assessment that she did not meet its legitimate expectations. She provides self-assessment of her work at IU and contends that she performed her job diligently and accomplished tasks at the highest standard. Dr. Feresu explains that she was hired by IU to help start the epidemiology program and that she in fact did help start the program. However, the individuals involved with the pre-tenure review process acknowledged this contribution but still determined that her research was unsatisfactory. Accordingly, Feresu's argument that she helped start the epidemiology program does not create a genuine issue of material fact regarding her Title VII claim because it does not undermine or challenge the veracity of IU's decision to deny tenure based on research considerations.

Dr. Feresu describes her perception that many people in her department and in the administration at IU did not like her because of her race, gender, and nationality. However, her assertions are not supported by citations to evidence, and many of the citations she points to materials that do not support Dr. Feresu's assertions. For example, Dr. Feresu asserts that Associate Dean Kathleen Gilbert "had threatened to fire me in 2012," ([Filing No. 54-1 at 10](#)). Dr. Feresu cites to "Attachment 4," which is an email string between Dr. Feresu and Dean Gilbert ([Filing No. 55-4](#)). However, this 2013 email string does not support Dr. Feresu's assertion that

Dean Gilbert threatened to fire her in 2012. Instead, Dean Gilbert's emails to Dr. Feresu simply describe how she was helping facilitate the pre-tenure review process according to IU's policies.

Dr. Feresu states that "[a]ll my annual reports for 2010, 2011, and 2012, which went to Vice Provost Gieryn, were satisfactory. Never at any time was I in doubt I was doing something which was satisfactory and meeting the University standards and expectations." (Filing No. 54-1 at 11.) But Dr. Feresu provides no citation to any evidence to support her assertion, and the Court could not find in Dr. Feresu's submitted materials any "annual reports" or employee evaluation reports for 2010, 2011, or 2012.

As another example, Dr. Feresu explains:

> I have written extensively about my poor irredeemable work relationship with Dr [sic] Ka He. I am a woman, who had created the Epidemiology and Biostatistics program at IU. I knew everything. He was my boss. Instead of working with me, he got threatened, and really tortured me, to no end. I do not know how Chinese men relate to women, and black people. I have many Chinese friends, but he was one different Chinese person, who really ruined my life. He tortured me, while everyone watched. It went on and on and on, until Provost Robel, Dr [sic] Torabi on one issue, kind of stepped in (Attachment 8). Whether he was doing it on behalf of Vice Provost Gieryn, or Dr [sic] Torabi, or Dr [sic] Reece, it is anyone's guess. But, Dr [sic] Ka He himself, is evil, and [he] should have no place in academia. He tortured me to the core- I felt like I was in North Korea, or somewhere, not in the USA.

(Filing No. 54-1 at 11–12.) "Attachment 8" is an email string involving Dr. Feresu, Dean Gilbert, and V.P. Gieryn, which discusses the selection and composition of Dr. Feresu's pre-tenure review committee (Filing No. 55-8). This email string does not support Dr. Feresu's assertions that Dr. He tortured her and ruined her life, and further, it does not support Dr. Feresu's sheer speculation that IU administrators were using other faculty to discriminate against her.

The Court notes that despite Dr. Feresu's assertions, many of her evidentiary assertions point to emails that do not contain discriminatory statements by or conduct of IU and its employees but rather contain Dr. Feresu's own words regarding her perception and feelings of discrimination.

These emails and Dr. Feresu's unsupported assertions cannot create a triable issue of fact on the Title VII claim. In addition, Dr. Feresu has not submitted any affidavits from witnesses, so as to provide non-hearsay and admissible evidence. As the Seventh Circuit has often stated, "summary judgment is … moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" *Koszola v. Bd. of Educ. of City of Chi.*, 385 F.3d 1104, 1111 (7th Cir. 2004) (quoting *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 901 (7th Cir. 2003)).

There is no evidence that creates an issue of fact regarding IU's determination that Dr. Feresu was not meeting its legitimate expectations, that she likely would not receive tenure, and that she should not be reappointed after her pre-tenure review. There is no evidence that suggests that IU's reason for not reappointing Dr. Feresu was a pretext for discrimination. Based upon the designated evidence in the record, no reasonable jury could infer that Dr. Feresu was denied tenure and reappointment because of her gender, race, or nationality. Therefore, summary judgment in favor of IU is appropriate on the Title VII claim.

### 3. <u>Other Assertions</u>

Because of Dr. Feresu's emphasis on the October 30, 2012 incident when she was removed from her class, the Court finds it important to briefly and separately address this incident. Dr. Feresu discusses this incident numerous times throughout her pleadings and filings; however, she does not point to any material that would suggest this incident occurred because of any discriminatory intent. Rather, Dr. Feresu suggests that removal from the classroom was improper and based on fabricated student complaints. Yet the materials still do not show or infer any discriminatory intent beyond Dr. Feresu's own speculation regarding the intent of those involved. Regardless of the lack of supporting evidence, as IU pointed out, this incident occurred more than

three hundred days prior to the filing of Dr. Feresu's first EEOC Charge of Discrimination and therefore is time barred by 42 U.S.C. § 2000e-5(e). This incident cannot help Dr. Feresu's Title VII claim survive summary judgment. *See Blasdel*, 687 F.3d at 815 (acts alleged in EEOC charge of discrimination that occurred before the 300-day window are time barred).

The Court also briefly addresses Dr. Feresu's claim of discrimination based on Dr. Barbara Van Der Pol's ("Dr. Van Der Pol") salary compared to Dr. Feresu's salary. Dr. Feresu asserts that Dr. Van Der Pol is a white woman from the United States of America who worked in the same department with Dr. Feresu. She asserts that she was more educated and qualified than Dr. Van Der Pol. Dr. Feresu then asserts that IU discriminated against her as shown by Dr. Van Der Pol's greater salary in spite of her education and qualifications. However, Dr. Feresu fails to point to any authenticated, admissible evidence to support her claim that Dr. Van Der Pol was paid more than she was. Dr. Feresu points to no evidence regarding Dr. Van Der Pol's education and qualifications. Instead, Dr. Feresu points to a document that she herself created that appears to be a summary of her allegations in chart form (Filing No. 55-1). This unsupported, unsworn, unauthenticated summary is not evidence that can support a discrimination claim at the summary judgment stage. *See Powers v. Runyon*, 974 F. Supp. 693, 696–97 (S.D. Ind. 1997) (citations and quotation marks omitted) ("affidavits presented in opposition to the defendant's motion [must] be based upon personal knowledge;" "a statement merely indicating that a purported affidavit is based upon 'information and belief' is insufficient;" "[c]onclusory statements or indications of opinion or belief offered without any factual support are also insufficient to create a genuine issue of fact;" "affidavits must cite specific concrete facts establishing the existence of the truth of the matter asserted;" "in order to be considered in supporting or opposing a motion for summary judgment, documents must be authenticated;" and "in order for a document to be considered by a court in

ruling on a motion for summary judgment, the document must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence"). There is no genuine issue of disputed fact regarding whether Dr. Feresu's termination was based on discrimination; accordingly, summary judgment is **granted** on this claim.

**B.      Dr. Feresu's Equal Pay Act Claim**

The Equal Pay Act provides as follows:

> No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . . .

29 U.S.C. § 206(d).

IU asserts that Dr. Feresu's EPA claim must fail because it exceeds the scope of Dr. Feresu's first and second Charges of Discrimination filed with the EEOC. In her first EEOC Charge, Dr. Feresu alleged, "[w]hen initially hired, I was brought in at a lower rank than my White counterparts despite my vast experience. I was also given lower start up research funding than my White colleagues." (Filing No. 44-2 at 4.) These allegations concern race, not gender, and the EPA is concerned only with gender. In Dr. Feresu's second EEOC Charge, there are no allegations of unequal pay (*see* Filing No. 44-2 at 6).

IU asserts that the EEOC did not interpret Dr. Feresu's allegations as raising an EPA claim. The EEOC did not indicate that Dr. Feresu's Charges invoked "The Equal Pay Act (EPA)" in either of the Notices of Charge of Discrimination that it sent to IU even though the notice form expressly provides the opportunity to do so (*see* Filing No. 44-2 at 3, 5). IU notes that nothing in

Dr. Feresu's allegations presented to the EEOC involved an EPA claim, and when a plaintiff receives a right to sue letter from the EEOC, "the scope of the subsequent judicial proceedings is limited by the nature of the charges filed with the EEOC. An aggrieved employee may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination." *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992). A "plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). IU argues that, because Dr. Feresu did not assert an EPA claim with the EEOC, Dr. Feresu cannot now assert an EPA claim in this litigation.

IU argues that even if the Court were to evaluate the merits of Feresu's EPA claim, it cannot survive summary judgment, because Dr. Feresu points to only two examples and neither supports an EPA violation. Dr. Feresu's first comparison is to Dr. Van Der Pol, who had the same position within the same department as Dr. Feresu. Dr. Van Der Pol allegedly received more pay than Dr. Feresu. However, Dr. Feresu's comparison to Dr. Van Der Pol is unavailing because the EPA considers unequal pay on the basis of differing genders, and Dr. Feresu and Dr. Van Der Pol are the same gender.

Dr. Feresu's second example alleged under her EPA claim is Dr. Aurelian Bidulescu ("Dr. Bidulescu"), who began working at IU at the start of the Spring 2014 semester. Dr. Bidulescu, like Dr. Feresu, was an associate professor in the epidemiology department. Unlike Dr. Feresu, Dr. Bidulescu is male. While Dr. Bidulescu and Dr. Feresu are opposite sexes and Dr. Bidulescu was paid more than Dr. Feresu, IU explains that Dr. Feresu's claim still fails because she did not allege and she cannot show that they performed equal work on jobs requiring equal skill, effort,

and responsibility, which were performed under similar working conditions as required by the EPA. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974).

IU explains that when Dr. Bidulescu began working at IU at the start of the Spring 2014 semester, Dr. Feresu was beginning her last semester of work at IU in her "terminal year." Dr. Feresu's opportunity to pursue tenure was over while Dr. Bidulescu was still eligible for tenure. Because Dr. Feresu was in her terminal year with only a few months of employment left, her salary was frozen at the level set in the previous budget adjustment. Dr. Bidulescu was a tenure candidate whose employment at IU was just beginning, not ending. IU asserts that these differences justified the differential in pay.

Additionally, IU explains, the EPA provides exceptions to the general rule of equal pay, and one of those exceptions is "where different payment to employees of opposite sexes 'is made pursuant to . . . a differential based on any other factor other than sex.'" *Corning Glass Works*, 417 U.S. at 196; 29 U.S.C. § 206(d). "[A]n employer may consider the market place value of the skills of a particular individual when determining his or her salary." *Horner v. Mary Institute*, 613 F.2d 706, 714 (8th Cir. 1980). If a prospective employee's "experience and ability made him the best person available for the job," it is not a violation of the EPA to pay that person a higher salary if it was "necessary to hire him." *Id.* In such a case, the pay differential is "based on a factor other than sex." *Id.* IU further points out that "[w]ages at one's prior employer are a 'factor other than sex' and [may be used] to set pay consistently with the Act." *Wernsing v. Dep't of Human Servs.*, 427 F.3d 466, 468 (7th Cir. 2005).

IU explains that when Dr. Bidulescu was hired three and a half years after Dr. Feresu was hired, market conditions required that to persuade Dr. Bidulescu to leave his existing position with the Morehouse School of Medicine, IU would have to match the salary he was receiving there. IU

considered Dr. Bidulescu to be the ideal candidate for filling its needs. Thus, IU based Dr. Bidulescu's starting salary on the salary that he was receiving at the Morehouse School of Medicine. IU asserts that the hiring of Dr. Bidulescu at the rate he was paid was a gender-neutral, reasonable decision made within the permissible discretion of IU and in keeping with the dictates of the market. Therefore, the differential in pay fell within one of the exceptions to the EPA.

Dr. Feresu failed to respond to IU's argument that her EPA claim is outside the scope of the EEOC Charges. The fact that the EPA claim is not within the scope of the EEOC Charges is a sufficient basis to grant summary judgment to IU on the EPA claim. Even if the Court were to look past the issue of the EPA claim being outside the scope of the EEOC Charges, Dr. Feresu's EPA claim still could not survive summary judgment because IU has provided a legitimate basis for the pay differential between Dr. Feresu and Dr. Bidulescu.

Dr. Feresu alleges that she was paid $89,040.00 by the University of Nebraska Medical Center when she left her employment there to work for IU. Her starting pay was $72,000.00 at IU with "$10,000 in start-up funds to facilitate [her] research, teaching, and service obligations." (Filing No. 44-1 at 7–8.) In 2014, when she was in her terminal year and stopped working at IU, Dr. Feresu was paid $87,060.00 (Filing No. 44-3 at 3). Dr. Bidulescu was paid $46,500.00 for his first semester at IU in 2014 ($93,000.00 annually) (Filing No. 44-3 at 5). Dr. Feresu complains that her salary was never adjusted to match Dr. Bidulescu's salary of $93,000.00, and she should have been paid that amount for her position as an associate professor.

IU explains that Dr. Feresu's salary was not adjusted to match Dr. Bidulescu's salary because, at the time of Dr. Bidulescu's hiring, it had long been determined that Dr. Feresu would not be reappointed or granted tenure, so she was in her terminal year during which her salary was frozen at the level set in the previous budget adjustment in accordance with IU policies and

procedures. Dr. Feresu's argument fails to undermine IU's gender-neutral explanation that three and a half years after Dr. Feresu was hired, the market conditions required IU to offer Dr. Bidulescu a salary that would match his current salary in order to induce him to work for IU. In reaching this decision, the Court also notes the recent decision in the Ninth Circuit which held that an employer may pay a woman less than a man for the same work, if the man was paid more at his previous job and the employer had a reasonable policy to justify reliance on past salaries. *See Rizo v. Yovino*, No. 16-15372, 2017 U.S. App. LEXIS 7427 (9th Cir. Feb. 17, 2017).

The EPA claim is beyond the scope of the EEOC Charges and therefore is not appropriately brought in this litigation, and additionally, even if it was appropriately before the Court, there is an insufficient basis to support this claim. As such, the Court determines that summary judgment in favor of IU is appropriate on the EPA claim.

## IV. CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment filed by Defendant Trustees of Indiana University is **GRANTED**, and Dr. Feresu's Title VII and EPA claims are **dismissed** (Filing No. 42). The Court previously dismissed Dr. Feresu's two other claims brought pursuant to the Americans with Disabilities Act and Section 1981 based on IU's Eleventh Amendment immunity (Filing No. 20 at 8). Having dismissed all of Dr. Feresu's claims against IU, the Court will issue Final Judgment under separate order.

**SO ORDERED.**

Date: 5/2/2017

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

Distribution via electronic mail:

Dr. Shingairai Feresu
sferesu@yahoo.com
sferesu@gmail.com

Cory Stephen Brundage
CORY BRUNDAGE, LLC
cb@brundagelaw.com

Distribution via U.S. Mail:

Dr. Shingairai Feresu
204 Smith Street
Mucklenuek Pretoria 0002
South Africa